2022 IL App (2d) 210404
No. 2-21-0404
Opinion filed February 23, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* H.B., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | No. 18-JA-21 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Christopher B., | ) | Kathryn Karayannis, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice Bridges and Justice McLaren concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, Christopher B., appeals from the trial court's order finding him unfit to parent

his son, H.B., and terminating his parental rights. His sole contention is that the trial court erred

by conducting the termination proceedings in a hybrid in-person/remote format. We disagree and

affirm.

¶ 2                                    I. BACKGROUND

¶ 3                                  A. Adjudication Phase

¶ 4        In June 2018, the State filed a petition for adjudication of wardship against respondent and

H.B.'s mother, Stephanie M.,[1] under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1

_____

        [1] Stephanie ultimately consented to adoption and is not a party to this appeal.

*et seq.*) (West 2018)). The State alleged H.B. was neglected based on an injurious environment (*id.* § 2-3(1)(b)).

¶ 5    In August 2018, the trial court entered an adjudicatory order, finding H.B. was neglected as alleged in the State's petition. In November 2018, the court entered a dispositional order (1) finding respondent was unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline H.B. and (2) granting the Department of Children and Family Services (DCFS) custody, guardianship, and the right to place H.B.

¶ 6                                B. Termination Phase

¶ 7    In July 2019, the State petitioned to terminate respondent's parental rights. It alleged respondent was unfit due to his failures to (1) maintain a reasonable degree of interest, concern, or responsibility as to H.B.'s welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) protect H.B. from the conditions that were injurious to his welfare (*id.* § 1(D)(g)); (3) make reasonable efforts to correct the conditions that were the basis for removal of H.B. (*id.* § 1(D)(m)(i)); and (4) make reasonable progress toward the return of H.B. in the initial nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 8    Trial commenced on January 15, 2020. The court heard testimony on that day, as well as on January 16, February 20, February 21, and March 9, 2020. All 20 witnesses who testified on those dates did so in person. On March 9, the State called Stephanie as a witness, and, when the proceedings broke for the day, cross-examination of her had not yet been completed. The trial was continued to March 26, 2020.

¶ 9    In the meantime, on March 16, 2020, the chief judge of the Sixteenth Judicial Circuit entered General Order No. 20-07, effective March 17 (Kane County Cir. Ct. G.O. 20-07, (Mar. 17, 2020)), in response to the emerging COVID-19 pandemic. The order continued all matters, subject

to a few exceptions, for "at least 35 days." *Id.* On May 1, 2020, the presiding judge of the juvenile division entered an administrative order that set forth temporary procedures that applied to pending juvenile matters. See *In re COVID-19 Temporary Procedures for Juvenile Division Matters*, Kane County Cir. Ct. Family Div. Admin. Order (May 4, 2020), https://cic.countyofkane.org/ Admin%20Orders/Family%20Division/Family%20Division%20Maters%E2%80%8B%E2%80 %8B%E2%80%8B%20wdd,%205-4-020.pdf[https://perma.cc/JS7B-N9AN]. In pertinent part, the order permitted the trial court, in its discretion, to allow contested juvenile matters to proceed remotely or in a hybrid manner, over any party's objection, with certain safeguards, provided it first allowed the objecting party to show why he or she would be prejudiced by the procedure. *Id.*

¶ 10     On June 22, 2020, the matter convened for the continued trial. The assistant state's attorney (ASA) appeared in person, while the parties, their attorneys, the court appointed special advocate (CASA), the CASA's supervisor, and the CASA's attorney appeared remotely via the Zoom videoconferencing application. At the time, respondent was in the custody of the Illinois Department of Corrections (IDOC). While the parties and the attorneys were identifying themselves for the record, respondent interjected, asking to speak with his attorney because he had not spoken to her since March. He continued, "I don't know what's going on. I am on a tiny little phone." He stated, "[t]his isn't fair," and asked the court to continue the case until August.

¶ 11     The court then asked if there were any objections to proceeding in a hybrid manner, and respondent raised his hand. Respondent and his attorney were then admitted into a private "break-out room" to discuss his objection. When respondent and his attorney were admitted back into the hearing room, respondent's attorney withdrew the objection. No evidence was presented that day. Instead, the matter was continued to September 23, 2020. Respondent indicated he believed he

would be released from IDOC custody before that day, and his attorney told the court she would appear in person with respondent.

¶ 12    On September 23, 2020, two ASAs, respondent, respondent's attorney, and the CASA's attorney appeared in person. Stephanie, her attorney, the CASA, and the CASA's supervisor appeared on Zoom. After the parties and attorneys identified themselves, the court noted it was proceeding on a hybrid platform and asked the parties whether they had any objections. No objections were raised. The court reminded the participants that the proceedings were confidential and asked that any nonparty leave the location where the remote participants were. It also stated that recording or live streaming of the proceedings was not permitted and asked all participants to act as if they were physically present in the courtroom.

¶ 13    The court then noted the trial last broke on March 9, 2020, during cross-examination of Stephanie. The court asked if anyone was not prepared to proceed and received no responses. It then asked, "Is there anything we need to address prior to [re]commencing the Cross-Examination [(of Stephanie)]?"

¶ 14    The State requested that both respondent and Stephanie be physically present in court if and when they testified. The State's concern was that the court would not otherwise have the full opportunity to observe their demeanor. The State asked, however, that its witnesses be allowed to appear remotely. Stephanie's attorney responded that Stephanie "ha[d] hesitation about the entire proceeding being done by Zoom." Stephanie's attorney stated she, too, had "reservations *** about a termination trial at all being conducted by Zoom" because of the significant rights at issue. Stephanie's attorney stated she was "super high risk" (presumably to suffer severe illness from COVID-19), however, and, if the court required Stephanie to come in, she would "probably try to make arrangements to have [a different attorney] come sit with [Stephanie]" while she appeared

remotely. Respondent's position was that if he and Stephanie were required to testify in person, then all witnesses should be required to testify in person. He noted he had a "right to face the witnesses in person." The CASA joined the State's request and noted Stephanie had moved in and out of the Zoom frame during the discussion (not during her testimony).

¶ 15    The court observed Stephanie appeared to be having difficulties with the audio and video feed, she had been moving in and out of the frame, and someone else was present in the room she was using (Stephanie had shushed someone in the background). The court found it would have trouble observing Stephanie and, more importantly, that Stephanie would have trouble hearing the proceedings. After noting that felony jury trials had been proceeding during the pandemic, the court stated it would require Stephanie to come to court to conclude her cross-examination. It also stated it would require respondent to be present in the event he testified. Regarding all other witnesses, the court stated it would consider requiring the witnesses to testify in person on an individual basis and would require any witness appearing remotely via Zoom to have a hardwired connection. The court also stated it would inquire whether there was a larger courtroom "if that [made] people more comfortable" but it could nevertheless accommodate Stephanie's physical presence while maintaining proper social distancing.

¶ 16    The court then invited the State to call a witness out of order. The State indicated it could call a domestic violence counselor, Michelle Diaz, who was in the Zoom waiting room. (Diaz was the State's last witness.) The court asked respondent whether his position was the same—*i.e.*, that all witnesses should be required to appear in person, and he responded affirmatively. The State told the court it had explained to Diaz that she should treat the proceedings the same as if she were physically present in the courtroom and that she should not refer to any notes or documents without the court's permission. The State also told the court that Diaz had family members who were

"particularly vulnerable" (presumably to severe illness from COVID-19) and that she was requesting to appear remotely but would appear in person if ordered to do so.

¶ 17    The court stated it would break so the parties could discuss with their attorneys their positions on the hybrid proceedings and the court could determine courtroom setups it could offer if the matter was to proceed on Zoom. It noted that, if the matter did not proceed in at least a hybrid manner, then it was possible the trial would not move forward for "a very long time," which was not in "anyone's best interests." It stated, "Again, we are doing felony jury trials. I think *** we can accommodate this."

¶ 18    After the break, the court stated the proceedings had been moved to a different courtroom to allow for social distancing. It took note of its discretion to control the proceedings and, in the exercise of that discretion, determined the matter would proceed in a hybrid manner. The court stated it would permit certain witnesses to testify remotely and require others to testify in person. Stephanie reiterated her hesitance to proceed in a hybrid manner, especially given her attorney could not appear in person. The court stated it would allow Stephanie and her attorney to communicate by phone or in person (by recessing the proceedings) while Stephanie was not testifying. Respondent reiterated his argument that all witnesses should be required to appear in person, so that he could have the opportunity to observe the witnesses' mannerisms and behavior, and he noted it was "very difficult to see the screen" from where he and his attorney sat, because of a glare on the screen. The court closed the blinds, and respondent did not again complain of his inability to see the screen.

¶ 19    The court stated its ruling would stand and that the case would proceed in a hybrid manner. It noted it had considered the rights at issue and did not believe any of those rights would be impacted by the witnesses testifying remotely. Further, it noted, a courtroom that would allow

proper social distancing was available, should Stephanie's attorney choose to appear in person. The court also noted it could change its decision if the hybrid proceedings proved problematic.

¶ 20 The court admitted Diaz via Zoom into the hearing room and, before her testimony, told her the proceedings were confidential, that audio or video recording was not permitted, that all nonparties present in her location should leave, that she should conduct herself as if she were present in the courtroom, and that she could not look at any documents or notes without the court's permission.

¶ 21 The State presented Diaz's testimony, which largely concerned Stephanie's engagement with domestic-violence counseling. Diaz's remote testimony continued into the next day, and she again testified via Zoom. Prior to the recommencement of her testimony, however, the court formally found, on the State's request, good cause for permitting Diaz to testify remotely, because she had a family member who was particularly vulnerable to severe illness from COVID-19. Respondent's attorney cross-examined Diaz and made several objections during her testimony. At no time did respondent or his attorney raise any concern with their ability to hear Diaz's testimony or observe her demeanor. Stephanie then finished her testimony in person (with her attorney appearing remotely).

¶ 22 On October 8, 2020, the trial reconvened. The State did not present testimony; instead, it introduced eight recordings of phone calls made by respondent while in custody and then rested its case. Stephanie asked for leave to file a written motion for a directed finding. The court granted the request and set the motion for hearing on December 4, 2020.

¶ 23 On November 19, 2020, in response to increased community transmission of COVID-19, the chief judge entered General Order No. 20-29 (Kane County Cir. Ct. G.O. 20-29 (Nov. 30,

2020)). The order provided that, beginning on November 30, 2020, all matters were to be heard remotely until at least February 1, 2021. *Id.*

¶ 24    Thus, on December 4, 2020, all parties and their attorneys appeared via Zoom. The court denied Stephanie's motion and continued the matter to March 8, 2021.

¶ 25    On March 8, 2021, the matter reconvened with all parties and their attorneys appearing via Zoom. Respondent was prepared to present evidence but nevertheless moved to continue the proceedings. (Stephanie joined his motion.) Respondent's attorney noted respondent "ha[d] always made it clear that he would prefer to proceed with this matter in person as well as having the witnesses testify in person." The court asked the CASA's attorney whether H.B.'s therapist believed further delay would be detrimental. The CASA's attorney responded the therapist believed it would not be detrimental, because visitation between respondent and H.B. had been suspended. The State had no objection. The court, after noting in-person proceedings were being conducted only with special permission, granted respondent's request, "based upon primarily the therapist indicating this would not at this point be detrimental to the minor."

¶ 26    On June 2, 2021, the ASA, respondent, respondent's attorney, Stephanie, and the CASA's attorney appeared in person. Stephanie's attorney, the CASA's supervisor, Lacey Timoti, a Children's Home and Aid caseworker, and Timoti's supervisor appeared via Zoom. As previously noted, Stephanie executed an irrevocable consent to adoption, and she was excused. Accordingly, the remainder of the termination trial concerned only respondent. The CASA presented her evidence, which consisted of audio recordings of phone calls made by respondent while in the custody of the Kane County jail and various documents, and then rested.

¶ 27    Respondent testified on his own behalf, presented the testimony of the CASA and his sister, both of whom testified in person, and then rested.

¶ 28    In rebuttal, the State called Timoti, who testified via Zoom. Before Timoti's testimony, the court cautioned her that she was not to communicate with anyone during her testimony and that she could not refer to any documents absent the court's permission to do so. Her testimony focused on respondent's effort, or lack thereof, to contact the agency and his failure to engage in services after his release from IDOC in July 2020, which contradicted respondent's testimony. Respondent's attorney cross-examined her, and neither respondent nor his attorney raised any concerns about their ability to hear her testimony, observe her demeanor, or gauge her credibility.

¶ 29    The State rested in rebuttal, and, after hearing the parties' summations, the court continued the matter to June 23, 2021, for its ruling. That day, the proceedings took place in the hybrid manner used throughout the proceedings. The court found respondent was unfit, finding the State had proved the allegations of its termination petition.

¶ 30    The matter proceeded to a best-interests hearing, at which H.B.'s therapist, a foster parent, and respondent all testified in person. At the conclusion of the hearing, the court found it was in the H.B.'s best interests to terminate respondent's parental rights.

¶ 31    This appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33                        A. Illinois Supreme Court Rule 311

¶ 34    Initially, we note we have issued our decision outside the 150-day timeframe specified in Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which states, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Respondent filed his notice of appeal on July 20, 2021. Thus, the record on appeal was due in this court on August 24, 2021, and our disposition was due on December 17, 2021. See Ill. S. Ct. R. 311(a)(4), (5) (eff. July 1, 2018).

¶ 35    On August 17, 2021, respondent moved this court for an extension of time to file the record, supported by an affidavit from the court reporter, requesting an extension to September 14, 2021. We granted respondent's motion, and the record was filed on September 14, 2021, and supplemented with the bulk of the report of proceedings on October 7, 2021.

¶ 36    On October 4, 2021, respondent moved this court for an extension of time to file his brief, asserting that, due to the delay in receiving the complete report of proceedings, the sheer volume of the record itself (the report of proceedings is nearly 1700 pages and the exhibits total more than 2000 pages), and his attorney's other professional obligations, he needed an additional 21 days to file his brief. We granted his request and ordered his brief be filed no later than October 26, 2021.

¶ 37    On October 26, 2021, respondent's appointed appellate counsel moved for leave to withdraw as counsel, purportedly in accordance with the procedures set forth in *Anders v. California*, 386 U.S. 738 (1967). See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (noting appellate counsel in termination proceedings may move to withdraw in accordance with *Anders*). In pertinent part, counsel noted he had consulted with respondent and learned respondent took issue with, among other things, the hybrid in-person/remote nature of the proceedings. Counsel asserted that he found persuasive the court's reasoning in *In re P.S.*, 2021 IL App (5th) 210027, which found a fully remote termination trial did not violate the respondent's due-process and confrontation-clause rights, and counsel "elect[ed] to leave it to the discretion of this Honorable court to choose whether the court wishes to address the issue." He did not sketch out a potential argument, present any analysis of the issue, or explain the argument's frivolity. See *In re Austin C.*, 353 Ill. App. 3d 942, 946 (2004). Accordingly, we denied counsel's motion without prejudice. We directed counsel to reconsider his conclusion regarding the hybrid nature of the proceedings and file an amended *Anders* motion or brief no later than November 23, 2021. We also ordered

counsel, in the event he elected to file an amended *Anders* motion, to "full[y] analy[ze] the issue and explain*** why he believe[d] such an argument would be frivolous."

¶ 38    On November 23, 2021, respondent's counsel filed an amended motion to withdraw under *Anders*. This time, counsel provided little more analysis but cited two additional cases, *In re R.D.*, 2021 IL App (1st) 201411, and *In re Aa. C.*, 2021 IL App (1st) 210639, that came to similar conclusions as did *P.S.*[2] He again asserted the recent case law, which involved similar scenarios and discussed many of respondent's concerns, was persuasive. He noted that those decisions had analyzed due-process claims under the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), but he failed to offer any analysis of those factors under the facts of this case. On December 1, 2021, we denied counsel's amended *Anders* motion with prejudice and directed respondent to file a brief no later than December 15, 2021. See *Austin C.*, 353 Ill. App. 3d at 948 (explaining the appellate court has three discretionary options when appointed counsel does not comply with *Anders*). The parties thereafter complied with shorter briefing deadlines, and the case was submitted for decision on January 7, 2021.

¶ 39    In light of the foregoing, we find we have good cause to excuse our failure to issue our decision within the timeframe set forth in Rule 311(a)(5). See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 40                    B. Forfeiture and Respondent's Noncompliance with

Illinois Supreme Court Rule 341

_____

[2] Both *R.D.* and *Aa. C.* were decided before counsel's initial *Anders* motion, but counsel neither cited nor discussed them.

¶ 41    We first address the State's contention that respondent has forfeited his contention on appeal by failing to adequately argue it under Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). Rule 341(h)(7) requires a party's brief to present argument, which must contain the contentions of the party and be supported by citation to the authority and the pages of the record relied on. *Id.* A party must clearly define the issues to be decided and set forth cogent arguments in support of his or her position. *Maday v. Township High School District 211*, 2018 IL App (1st) 180294, ¶ 50. Indeed, it is well settled this court "is not a repository into which an appellant may foist the burden of argument and research." *Ramos v. Kewanee Hospital*, 2013 IL App (3d) 120001, ¶ 37. A party forfeits an argument when he or she fails to adequately develop it. *Maday*, 2018 IL App (1st) 180294, ¶ 50.

¶ 42    Respondent's brief fails to comply with the requirements of Rule 341(h)(7). Respondent states the issue on appeal is whether the trial court abused its discretion in conducting the termination trial in a hybrid manner and, in doing so, violated his constitutional rights to due process and to confront the witnesses against him. However, the argument portion of respondent's brief is devoid of any reference to the court's discretion and any discussion of how the court's decision was an abuse of that discretion. Nor has respondent provided any true due-process or confrontation-clause analysis based on the specific facts of this case. Instead, after setting forth some relevant boilerplate law, pointing us to some of the recent case law on the issue, and directing us specifically to Justice Wharton's dissent in *P.S.*, respondent argues as follows:

"In relation to the instant appeal, [Justice Wharton's] dissent at [paragraph] 105 essentially echoes [respondent's] concern which his [trial] counsel adopted *** from [the ASA's] concerns *** about observation of a witness during testimony, 'Although video conferencing platforms like Zoom do not eliminate a judge's opportunity to observe a

parent's demeanor throughout the hearing[,] they do impose limitations.['] [Citation.] In the instant case, the testimony of *** Diaz *** was taken via Zoom on September 23, 2021, and September 24, 2021. Although it was the only witness testimony relative to [respondent's] case taken via Zoom[,] it was vital testimony that [respondent] believes had a high likelihood to be misinterpreted by the court due to the witness not appearing in person."

Respondent does not explain how Diaz's testimony was vital to the court's findings in relation to him. Nor could he. Diaz's testimony concerned *Stephanie's* engagement with domestic-violence counseling. (Respondent does not raise any argument regarding Timoti's rebuttal testimony, which was also taken remotely. Her testimony bore directly on respondent's fitness, as it concerned his efforts to engage with services after he was released from IDOC, and contradicted respondent's testimony that he attempted to engage in services.) Moreover, respondent does not explain how the safeguards employed by the trial court in this case were not adequate to protect his interest in maintaining a parental relationship with H.B.

¶ 43    Additionally, we must call attention to other shortcomings in respondent's brief. For instance, his statement of facts does not fully set forth all the facts necessary to understanding the single issue raised on appeal. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). While respondent includes an in-depth discussion of the procedural history of the case, more than half of his statement of facts discusses matters that have no relevance to the issue raised on appeal. And he has not set forth any of the in-court discussion regarding the hybrid format used here. He also states the standard of review is abuse of discretion but does not cite any authority in support of his assertion. See Ill. S. Ct. R. 341(h)(3) (eff. Oct. 1, 2020). We could strike respondent's brief and dismiss the appeal in light of these deficiencies (*In re Marriage of Reicher*, 2021 IL App (2d)

200454, ¶ 30), but we decline to do so. Forfeiture is a rule of administrative convenience and does not preclude us from considering an otherwise forfeited contention. See *Coley v. Bradshaw & Range Funeral Home, P.C.*, 2020 IL App (2d) 190627, ¶ 31. Indeed, forfeiture is a limitation on the parties, not this court. *CB Construction & Design, LLC v. Atlas Brookview, LLC*, 2021 IL App (1st) 200924, ¶ 19. Considering the nature of the interests involved here, *i.e.*, respondent's fundamental right to maintain a parental relationship with his child (see *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)), we choose to excuse respondent's forfeiture and consider the merits of his claims.

¶ 44                                   C. The Merits

¶ 45     Respondent contends the trial court abused its discretion in conducting the termination trial in a hybrid in-person/remote manner and, in doing so, violated his rights to procedural due process and to confront the witnesses against him. He asserts Diaz's testimony was vital, and, because it was given on Zoom, it was highly likely to be misinterpreted. Respondent does not raise any issue with the court permitting Timoti to testify in rebuttal via Zoom.

¶ 46     The State argues the hybrid nature of the proceedings did not violate respondent's rights to due process or to confront the witnesses against him. It argues that, even assuming the confrontation clause applies in proceedings under the Act, the right to be present and cross-examine witnesses, in person or otherwise, is not absolute. It asserts respondent "is unable to show any 'gross' deviation from fair due process procedures" or that the procedure used impinged upon the truth-seeking function of cross-examination. Further, the State contends the trial court struck an appropriate balance between respondent's rights and the government's interests in providing permanency for H.B. and protecting the public from a novel, deadly virus, and that it established adequate safeguards to protect those interests. Moreover, the State notes only 2 out of 25 witnesses

testified remotely, and respondent has taken issue with only one of those witnesses, Diaz, whose testimony concerned *Stephanie's* fitness. Thus, the State maintains, respondent cannot establish he was prejudiced by the trial court's decision to allow her to testify remotely.

¶ 47　As will be discussed more fully below, we first conclude the hybrid procedure did not violate respondent's right to procedural due process. Second, to the extent confrontation rights may be an aspect of due process in these civil proceedings, we find the procedure adequately protected respondent's right to confront the witnesses against him. Finally, we find the court did not abuse its discretion in employing the hybrid procedure under both Illinois Supreme Court Rule 241 (eff. May 22, 2020) and its own local administrative orders.

¶ 48　Before beginning our discussion, we find it useful to set forth the backdrop against which we are analyzing the issue. The fitness portion of this trial commenced in January 2020 and concluded almost 1½ years later, in June 2021. In the midst of the proceedings, the emergence of the SARS-CoV-2 virus, which can cause severe illness and death, upended our daily lives. The disease caused by the virus, COVID-19, was later declared a pandemic. Our supreme court has guided the lower courts of this state through the pandemic and has encouraged and promoted the use of technology to allow remote proceedings in all matters, where feasible and constitutionally sufficient. See generally Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020). To that end, the court directed lower courts to establish temporary procedures to minimize the impact of COVID-19 on the court system and its participants, while expanding access to the courts. With this in mind, we turn to the merits.

¶ 49　　　　　　　　　　　1. *Procedural Due Process*

¶ 50　At its core, procedural due process requires a party to be given the opportunity to be heard at a meaningful time and in a meaningful manner. *R.D.*, 2021 IL App (1st) 201411, ¶ 19. The

concept " 'is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). When determining whether a procedure is constitutionally sufficient, a court must consider and balance (1) the private interest affected, (2) the risk of an erroneous deprivation of that interest by using the procedure and the probable value of any additional or substitute safeguards, and (3) the governmental interests involved. *Id.* at 335.

¶ 51      After balancing the three *Mathews* factors, we conclude the trial court's use of a hybrid format did not deprive respondent of his right to due process. As to the first *Mathews* factor, a parent has a fundamental liberty interest in maintaining a parental relationship with his or her child. *Santosky*, 455 U.S. at 753; *In re D.W.*, 214 Ill. 2d 289, 310-11 (2005). Indeed, that interest is among the most " 'basic civil rights.' " *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)). And it "is perhaps the oldest of the fundamental liberty interests" recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion).

¶ 52      As to the second factor, respondent argues only that Diaz's testimony was "high[ly] likel[y] to be misinterpreted by the court due to the witness not appearing in person." He does not offer any argument as to how Diaz's testimony was susceptible to misinterpretation under the circumstances of this case or how any potential misinterpretation of her testimony would prejudice him. Instead, respondent points generally to Justice Wharton's dissent in *P.S.*, asserting the concerns raised by Justice Wharton "essentially echo" his position.

¶ 53      We note *P.S.* is distinguishable from this case. In *P.S.*, the parents' termination trial was conducted entirely on Zoom, over the respondent's requests for a continuance and for an immediate in-person hearing. *P.S.*, 2021 IL App (5th) 210027, ¶ 7. Here, the trial was conducted

in a hybrid manner. The court required respondent and Stephanie to be physically present while allowing two of the State's witnesses—the only witnesses who were called after the court implemented the hybrid procedure—to participate remotely, and respondent never requested a continuance until all witnesses could appear in person without a substantial risk to their health. All the recent case law on this issue is likewise distinguishable. *R.D.*, 2021 IL App (1st) 201411 (fully remote proceeding; administrative order *required* remote hearing, except for good cause); *Aa. C.*, 2021 IL App (1st) 210639 (same); *In re Es. C.*, 2021 IL App (1st) 210197 (same). But respondent does not recognize this distinction.

¶ 54      This distinction aside, in his dissent in *P.S.*, Justice Wharton emphasized the seriousness of the State action at issue, likening the termination of parental rights to a "parental death sentence." *P.S.*, 2021 IL App (5th) 210027, ¶ 95 (Wharton, J., dissenting). He noted, "[a] judge can only see what takes place within the video frame, and it is harder to watch parties' real time reactions to testimony when the parties and the witnesses appear in separate boxes." *Id.* ¶ 105. Accordingly, he argued, a court receiving remote testimony risked missing subtle but important clues that any given witness gives during his or her testimony and "[a] better opportunity to observe [the respondent's] temperament could have helped inform the court's decision." *Id.* ¶¶ 105-06, 108. He also noted there were particular challenges in that case, as one witness appeared to be using notes during her testimony. *Id.* ¶ 105. Thus, Justice Wharton concluded, the second *Mathews* factor—the risk of erroneous deprivation—"weigh[ed] at least slightly in favor of finding that due process required an in-person hearing." *Id.* ¶ 108.

¶ 55      We do not necessarily disagree with Justice Wharton that certain illuminating subtleties could in some circumstances be lost when a witness testifies remotely as opposed to in person. *Maryland v. Craig*, 497 U.S. 836, 851 (1990); see *R.D.*, 2021 IL App (1st) 201411, ¶ 15 (noting

in-person testimony and cross-examination are preferred over remote testimony); *People v. Lofton*, 194 Ill. 2d 40, 56 (2000) (citing *Craig* and noting preference for in-person confrontation); see also Ill. S. Ct. R. 241, Committee Comments (adopted May 22, 2020) (noting "the relative importance of live testimony in court"). But, under the facts of this case, we do not agree with respondent's suggestion that the procedure used here risked erroneously depriving respondent of his right to maintain a parental relationship with H.B. Indeed, nothing in the record supports respondent's suggestion and respondent can do nothing more than speculate as to how allowing the two witnesses to testify remotely affected the truth-seeking function of the trial.

¶ 56 The record shows the trial court established adequate safeguards to protect the integrity of the judicial process and allow respondent to confront the witnesses against him. Respondent was physically present in the courtroom, with his attorney, when both remote witnesses testified and was never prohibited from communicating with his attorney during the testimony. The court reminded all participants that the proceedings were confidential. Both remote witnesses were sworn, and they were visible on a screen in the courtroom. Respondent's attorney was permitted to fully cross-examine both witnesses, raised timely objections, and received rulings on those objections. Before Diaz's testimony, which concerned only *Stephanie's* fitness, the court instructed her to conduct herself as if she were physically present in the courtroom and reminded her that the proceedings were confidential, that all nonparties in her location should leave, and that she could not refer to any documents without permission. Before Timoti's testimony, to which respondent does not object, the court instructed her to not communicate with anyone during her testimony and to not refer to any documents without the court's permission. Thus, the procedure used was as close to in-person proceedings as the circumstances permitted. In light of the safeguards established in this case, we cannot conclude that whatever nuances may have been lost

by way of the witnesses' virtual appearances risked erroneously depriving respondent of his right to maintain a parental relationship with H.B.

¶ 57    As to the third *Mathews* factor, there is no dispute the government has significant interests in protecting minors' well-being and in expeditiously finding permanency for abused and neglected minors. See *R.D.*, 2021 IL App (1st) 201411, ¶ 21 (noting "[c]hildren have an interest in a stable home life free from the uncertain and fluctuating world of foster care" (internal quotation marks omitted)); *Es. C.*, 2021 IL App (1st) 210197, ¶ 24; *In re D.T.*, 212 Ill. 2d 347, 365 (2004); *In re D.L.*, 191 Ill. 2d 1, 13 (2000); see also *Lassiter v. Department of Social Services*, 452 U.S. 18, 32 (1981) (noting "child-custody litigation must be concluded as rapidly as is consistent with fairness"). Nor is there any dispute that the government has a significant interest in preserving public health and limiting the spread of a novel, deadly disease caused by a highly transmissible virus. See *JL Properties Group B, LLC v. Pritzker*, 2021 IL App (3d) 200305, ¶ 59 (noting both the government and the public have a strong interest in preserving public health).

¶ 58    Simply put, the trial court here carefully advanced the government's interests while establishing appropriate safeguards to decrease the risk of erroneously depriving respondent of his fundamental right to maintain his parental relationship with H.B. Under these circumstances, we conclude the trial court's use of hybrid proceedings for the trial did not violate respondent's right to procedural due process.

¶ 59                          2. *Confrontation Clause*

¶ 60    Defendant also argues the hybrid proceedings violated his sixth amendment right to confront the witnesses against him. We disagree.

¶ 61    The sixth amendment explicitly limits its application to *criminal* proceedings. U.S. Const., amend. VI. Termination proceedings under the Act are civil in nature. *In re E.S.*, 246 Ill. App. 3d

330, 335 (1993). However, termination proceedings involve fundamental liberty interests and invoke some of the constitutional concerns implicated in criminal cases. *In re J.R.*, 342 Ill. App. 3d 310, 316 (2003). The confrontation clause may well be one of these concerns, but it need not be strictly applied in termination proceedings. *In re R.D.*, 2021 IL App (1st) 201411, ¶ 13 (citing *In re K.L.M.*, 146 Ill. App. 3d 489, 495 (1986)). In the civil context, courts generally look to whether there has "been a 'gross' deviation from fair procedure." *Id.*

¶ 62    Even in the criminal context, however, the right to face-to-face confrontation is not absolute. *Id.* ¶ 14. "When evaluating whether the alternate procedure complied with the confrontation clause [(in the criminal context)], courts consider whether the procedure (1) impinged upon the truth-seeking purpose of the clause and (2) was necessary to further an important state interest." *Id.*

¶ 63    Respondent does not make any distinction between civil and criminal proceedings, and he has not pointed to any authority establishing that termination proceedings are subject to the more rigorous confrontation standard used in criminal proceedings. However, even if we were to apply the more rigorous standard, we find the proceedings here did not violate respondent's confrontation rights.

¶ 64    First, the hybrid procedure used in this case did not impinge upon the truth-seeking purpose of the confrontation clause. Admittedly, as noted, in-person testimony and cross-examination are preferred over remote testimony. See *Lofton*, 194 Ill. 2d at 56. However, as discussed in our analysis of respondent's due-process claim, the record shows the trial court took steps to ensure the remote witnesses' appearances were functionally equivalent to in-person appearances. Further, nothing in the record suggests the court, the parties, or the parties' attorneys were unable to view the witnesses as they testified, observe their demeanor, or evaluate their credibility. Under these

circumstances, we conclude the hybrid procedure used in this case "adequately ensure[d] that the testimony [was] both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony" (*Craig*, 497 U.S. at 851) and did not impinge on the truth-seeking purpose of the confrontation clause (*R.D.*, 2021 IL App (1st) 201411, ¶ 14).

¶ 65    Second, the hybrid procedure used here was necessary to further two important government interests: (1) the welfare of minors, including their interests in their own well-being and living in a stable environment and (2) the protection of the public from a deadly virus that spreads easily through in-person interaction. See *R.D.*, 2021 IL App (1st) 201411, ¶ 16. The trial court employed the hybrid procedure beginning in September 2020, at a time when this state was in the grips of the COVID-19 pandemic and when there were few authorized treatments and no vaccines. See *Emergency Use Authorization*, U.S. Food & Drug Admin., https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs (last visited Feb. 16, 2022) [https://perma.cc/9FVL-TP3R]. The hybrid procedure allowed the proceedings to move forward, facilitating permanency for H.B., while at the same time protecting the participants from the risk of illness. As our colleagues in the First District recognized, "[k]eeping children in limbo, particularly when they have already spent years in the system, would not further the [government's] interest in their welfare." *R.D.*, 2021 IL App (1st) 201411, ¶ 16.

¶ 66    For these reasons, we conclude that, to the extent respondent has confrontation rights in these civil termination proceedings, the hybrid procedure employed here did not violate that right.

¶ 67        3. *Illinois Supreme Court Rule 241 and Local Administrative Orders*

¶ 68    Respondent also contends the trial court abused its discretion by conducting his termination trial in a hybrid manner. Though respondent does not mention either the trial court's local

administrative orders or Illinois Supreme Court Rule 241 (eff. May 22, 2020), we find his argument implicates both the orders and the rule.

¶ 69    On May 1, 2020, the presiding judge of the juvenile division entered an administrative order setting forth temporary procedures to be used in pending juvenile cases. *In re COVID-19 Temporary Procedures for Juvenile Division Matters*, Kane County Cir. Ct. Family Div. Admin. Order (May 4, 2020). The order provided the judge assigned to a matter could, in his or her discretion, initiate remote proceedings. *Id.* The order directed the assigned judge to consider "such factors as the need for parties to appear, the evidentiary or non-evidentiary nature of the proceeding, [and] the need to involve a court reporter." *Id.* Additionally, the order provided as follows:

> "Eligibility for a contested remote hearing (remote hearing) is limited to cases wherein all parties are represented by attorneys, have access to the Zoom platform or telephonic conferencing, and in which the parties consent to the remote hearing. However, if all parties do not consent to the remote hearing[,] then the court may, in the exercise of its discretion and after affording the objecting party the opportunity to show why they would be prejudiced by a remote hearing, order the matter to proceed via a remote hearing or in a hybrid manner. These limits will be frequently reviewed and modified, when possible, in an ongoing effort to expand access to justice." *Id.*

The order also stated that remote proceedings were to "be conducted to the same standards as hearings in a courtroom" and in accord with the Illinois Code of Civil Procedure, the supreme court rules, and the court's local rules, but the precise method of hearing was reserved to the assigned judge's discretion. *Id.* Finally, the administrative order set forth certain safeguards, including that each witness was to (1) be alone in a secure room with closed doors, (2) wear

appropriate attire and conduct themselves as if they were appearing in a physical courtroom, and (3) ensure there would be no interruptions or distractions for the duration of their appearance. *Id.*

¶ 70    Illinois Supreme Court Rule 241 (eff. May 22, 2020) provides the court may, upon request or its own order, for good cause shown and upon appropriate safeguards, allow a witness to testify in a civil proceeding by videoconferencing from a remote location. The Committee Comments to Rule 241 explain "good cause" must be shown because of the importance of live in-person testimony. Ill. S. Ct. R. 241, Committee Comments (adopted May 22, 2020). "Good cause is likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident, illness, or limited court operations, but also in foreseeable circumstances such as residing out of state." *Id.* When allowing remote testimony, the court must impose adequate safeguards to ensure accurate identification of the participant and to avoid improper influences by any individual who may be present with the participant during their testimony. *Id.* Moreover, "[a] court has broad discretion to determine if video testimony is appropriate for a particular case," and it must balance all relevant considerations, including (1) any due-process concerns, (2) the ability to question witnesses, (3) hardships that may prevent the witnesses from appearing in person, (4) the type of case, (5) any prejudice to the parties if testimony is to occur by video conference, and (6) any other issues of fairness. *Id.*

¶ 71    Because both the local administrative order and Rule 241 invoke the trial court's discretion, we must determine whether the trial court's decision to proceed in a hybrid manner was an abuse of discretion. An abuse of discretion occurs when the trial court's decision is unreasonable. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009).

¶ 72    We conclude the trial court did not abuse its discretion by conducting the trial in a hybrid manner and permitting certain witnesses to testify remotely. Here, all parties were represented by

attorneys and, although respondent did not consent, the administrative order permitted the court, in the exercise of its discretion, to order the matter to proceed in a hybrid manner. The court, in accordance with the administrative order, afforded respondent the opportunity to explain his position. Respondent generally objected to the hybrid proceedings, noting he had the "right to face the witnesses in person" and he would not be able to fully observe the demeanor and assess the credibility of the witnesses appearing remotely. But the only specific concern respondent raised at any time in the proceedings was the presence of a glare on the screen in the courtroom in which the witness appeared, which was remediated when the court closed the blinds in the courtroom. Further, the trial court left open the possibility that it could reconsider its order if the hybrid proceedings proved to be problematic, but respondent never identified any specific problems with the format. Moreover, respondent has not established how the hybrid proceedings prejudiced him, and, given the fact Diaz's testimony had no bearing on the State's allegations concerning respondent, we fail to see how he could do so.

¶ 73    In addition, we note the trial court found there was good cause to allow Diaz to testify remotely, in accordance with Rule 241. Given Diaz's representation that she had a family member who was particularly vulnerable to severe illness if the family member contracted COVID-19, we do not disagree with that finding, particularly where respondent has not identified any instance in which he was unable to question Diaz or specified how he was prejudiced. See Ill. S. Ct. R. 241, Committee Comments (adopted May 22, 2020).

¶ 74    We acknowledge the trial court made no finding of good cause with respect to Timoti, who also testified remotely. However, respondent has not raised any issue on appeal concerning Timoti's remote testimony, and we will not advocate on his behalf.

¶ 75 In sum, the record shows the trial court carefully considered the competing interests, the rights at issue, respondent's arguments, and the fact that proceeding fully in person would cause additional delay, which was not in H.B.'s or any other party's best interests, and found it was proper to proceed in a hybrid manner. Under the facts of this case, we cannot say the trial court's decision was unreasonable.

¶ 76                                         III. CONCLUSION

¶ 77 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 78 Affirmed.

---

**No. 2-21-0404**

---

| | |
|---|---|
| **Cite as:** | *In re H.B.*, 2022 IL App (2d) 210404 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 18-JA-21; the Hon. Kathryn Karayannis, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Ronald L. Haskell, of St. Charles, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---